Petitioner v. Environmental Protection Agency. Ms. Berman for the petitioner, Mr. Cates for the respondent. Good morning, Ms. Berman. Good morning, Your Honors. Amanda Berman for VSS International with me at Council Table today is my colleague Felicia Issa. Your Honors, from the day that EPA first claimed that VSS should have had an FRP, EPA based that demand on the ground that VSS's facility is less than a half-mile from the Sacramento River Deep Watership Channel. EPA repeatedly asserted in letters to VSS and then in its briefs and arguments before the ALJ that there is a regulatory presumption that a spill from the facility, from a facility within a half-mile of a water body, will reach the water, causing substantial harm. There is no such regulatory presumption, Your Honors. To the contrary, EPA's regulations plainly direct that facilities must assess whether a spill will reach a nearby water body based on topography and other factors or not reach the nearby water body based on those factors. The presumption question is somewhat interesting, but I don't see why it matters here because there's very clearly an independent ground in the ALJ decision and the Appeals Board decision that there was proof and there's a battle of experts. It's a separate ground. It's supported by substantial evidence and you don't really even challenge the alternative ground. Your Honor, we strongly disagree that this is really an alternative ground, this line in the ALJ's decision about there being sufficient evidence, and there's three reasons for that. First, Your Honor, the evidence that the ALJ relied on leading up to that statement included EPA's experts' testimony that he applied the regulatory presumption. He started his analysis with that presumption and I quote, once I determined it was within a half-mile of the channel, that was the end of my calculation. And you can see that language at Joint Appendix, page 154. Second, the ALJ, in saying that there was sufficient evidence as sort of a backup to the discussion and the resting on what she called a finding that there was a regulatory presumption, she did not find that EPA had met its evidentiary burden of showing by a preponderance of the evidence that the regulatory criteria for an FRP were met. And she couldn't have so found since it's undisputed here that EPA's experts never did those D1 and D2 calculations that are required by the regulations. Now, BSS has argued at every stage. Can I ask you about that? So I think there are two factual findings that are at issue. One is where the ALJ said, even if the regulations did not presume that a discharge within one half-mile of a navigable water would automatically enter the water, there is sufficient modeling evidence in the record to demonstrate that portions of a worst-case discharge from the facility would in fact reach the channel. That's number one, which I think is a clear And then there's a second actual finding. In any event, the record shows that the catastrophic failure of one of VSS's 2.4 million gallon tanks would discharge oil more than 22 miles into the channel. Even without evidence to specifically quantify the degree of injury in this scenario, there is no doubt such a spill would cause some measurable adverse change either long-term or short-term in the chemical or physical quality or the viability of fish and wildlife in sensitive environments in the channel. So I think there are two factual findings. And the EAB said, we agree with ALJ on the second one. So I think that these two factual findings, which were also adopted and upheld by the EAB and are supported by evidence in the record, seem to foreclose the argument about the presumption. Your Honor, I disagree. To begin, I want to pull apart. There are two presumptions that were at issue here. One is the presumption that a spill is going to reach the channel. And the second is the presumption that EPA doesn't contest in its brief that it made such a presumption that any spill that does reach the water will meet those criteria of being likely to cause substantial harm. And Your Honor, there is a regulatory definition here that EPA never talks about. It's that substantial harm is defined to require a showing of injury. And injury is defined by the regulations as requiring a showing that there will be measurable adverse change in the chemical or physical quality of the resource. And while, Your Honor, that might seem like a safe bet where we're talking about something like asphaltic cement reaching the waterway, it is a requirement that EPA make that showing. And they never put forth any evidence going to what's going to happen in the waterway. This is a substance that hardens at ambient temperatures, so it would be solid. So I understand your argument to be that they didn't, they were trying to rely on the presumption and they didn't submit the evidence that you think is required. But the finding of the ALJ inferred that the evidence was there, and she made a factual finding, and it was upheld by the EAB. So just because the EPA didn't submit the evidence, we are reviewing what the ALJ did and what the EAB did, and she found that there was evidence. She inferred it. It's inferential, it's circumstantial, but she did find there was evidence, and it seems to be sufficient. Your Honor, we've argued at every stage that EPA didn't meet its burden here, and they do not contest that they didn't put forth evidence on this measurable adverse change issue. So we think that insofar as one characterizes that sufficient evidence point as a finding, and I don't think it's clear it is. The ALJ used the word finding in the first sentence about the presumption and not in the second sentence about sufficient evidence. But even if you want to look at that as a finding, it's not a finding that could have been supported by a preponderance of the evidence, because EPA put forth no D1 and D2 calculations. It put forth no evidence going to showing a measurable adverse change. And, Your Honor, I want to point you to what the EAB said at the end of its discussion about this, and it went right back to those two presumptions, and this is at JA-37. It's undisputed that VSS's facility is very close to the ship channel within southern boundary, only 200 feet away, well within the regulatory one-half mile distance set out in Section 5.5, which means that the proximity of the facility to sensitive resources in the event of an oil spill or leak could cause injury to them. It's therefore clear that VSS's facility meets all components of the substantial harm criteria. No, I agree that they also applied the presumption, but I think there's an alternative factual finding that was made, which is sufficient in and of itself, and then we don't have to address the presumption issue. Your Honor, I think this is a situation very like Fogo de Chao in that case, where, you know, this court went through the analysis and it found first that the main legal basis for the agency's decision in that case was wrong, put bluntly. And then it looked at a so-called alternative factual ground to uphold the decision, and it said that, you know, you can't rely on an alternative ground where it's far from clear that the agency would have reached the same decision on that basis alone. And, Your Honor, I think that is very far from clear here. From day one, EPA relied over and over on these presumptions. You know, it didn't even try to make an evidentiary argument until its reply brief after the ALJ hearing. As I mentioned, the ALJ's decision leads with its finding on the presumption. And, Your Honor, I know this court requested a copy of the transcript from the ALJ hearing, and I want to point you to some key places there. You know, at that hearing, EPA's expert testified that the requirement to do a D3 calculation was determinative of FRP applicability. He was asked, he was asked, you used the phrase we are assuming. Do you mean that the regulations make that assumption? His answer was yes. And, again, this is EPA's expert. Judge Bureau later asked, if it's within a half mile, do you actually do the D1 and D2 calculations, or do you just assume under the regulations that it reaches to the water? And EPA's expert said, the regulations state that if you're within a half mile, portions of a worst case discharge will reach. It's assumed. So, again, it was again and again, and it wasn't just EPA's legal position and that its experts went a different direction. The experts testified in support of that regulatory presumption, and their own testimony was that they started with that presumption. So, we do not think this is an independent ground on which the decision can fairly be upheld here. And, Your Honor, I see that I don't have a lot of time left, but I do want to highlight that. You know, it might seem like a foregone conclusion that a spill from a facility within a half mile will reach the waterway, but first off, it's not actually here. We're talking about asphaltic cement, a substance that is described as ranging at very high temperatures from being like corn oil to being more like peanut butter once you're at 150 degrees Fahrenheit. So, it's not a foregone conclusion here at all, Your Honor. And again, Your Honor, we would simply urge that, you know, there is regulatory text. I point the court to Section 5.1 of Attachment C. In particular, this is 40 CFR Part 112 Appendix C, Attachment C, 5.1. Facility owners must evaluate the potential for oil to be transported over land to navigable waters or be prevented from reaching navigable waters when trapped in natural man-made depressions. It also requires in 5.4 those D1 and D2 calculations. EPA's experts did none of that. We ask the court to hold the agency to the regulatory text. Thank you. Thank you. Mr. Cates, you're up. May it please the court, my name is Redding Cates and I'm here on behalf of the United States Environmental Protection Agency. With me at counsel table is Rebecca Reynolds from EPA Region 9. EPA's Environmental Appeals Board correctly affirmed the ALJ's finding that Petitioner BSS is required to prepare a facility response plan or FRP. Under the Oil Pollution Prevention Regulations, BSS is required to prepare an FRP if its facility, quote, could, because of its location, reasonably be expected to cause substantial harm to the environment by discharging oil into or on navigable waters. Do you agree that the agency orders under review had two independent alternative grounds? I do, yes. One is the presumption and one is just a fact-finding that the oil, A, would have reached the water and B, would have harmed it. Yes, just to be clear as Judge had noted, I think there were two actual findings and there were two regulatory interpretations. And if we read the administrative orders that way, the case is over? Yes, that's correct. Do you have a sense of how much one of these prevention programs costs? There was some discussion of it in the record. If memory serves, it's not in the appendix, but in the full transcripts. I believe Mr. Blackhammer from EPA was asked, I think he said $20,000. $20,000? I believe so. The cost to do what you want them to do? The cost to create the plan, that's right. But I'm not 100% sure, but I believe he was asked. A facility is expected to cause substantial harm when it meets certain criteria. For the ALJ below, the only criteria on which the party submitted conflicting evidence was whether a discharge from the facility could reach the navigable water, and if so, how far downstream it would travel. As noted, the ALJ found here that a worst-case spill from one of VSS's large above-ground tanks would flow across the 200 feet of ground between the tank and the channel. At the hearing, the parties presented conflicting expert evidence. The SSS experts said that a worst-case spill wouldn't reach the channel, and EPA's experts said that it would, and the ALJ sided with EPA for two reasons. One, the ALJ found EPA's expert, Mr. Michaud, more credible. He had over 34 years of experience modeling worst-case oil spills and had previously performed Mr. Capes, let me interrupt, but only because I'm with you on the, okay, your expert seemed better than the expert who didn't do the order of operations in a math equation correctly. The ALJ said such a spill, there's a question of whether the material will reach the water, and then there's a question of whether once it reaches the water, is it going to cause measurable, a measurable injury. Am I right about those two separated questions? Yes, I think that's fair. Okay, so my question is going to be about the second. Great. The ALJ said such a spill would cause, now I'm quoting, such a spill would cause some measurable adverse change either long or short term in the chemical or physical quality or the viability of fish and wildlife and sensitive environments of the channel, and of course the ALJ is quoting there themselves. Where did your expert say what the ALJ said? I try to do my best. There was testimony from Mr. Swackhammer, it's not in the joint appendix, but it is on page 55 of the transcript, where he was asked about asphalt cement causing oil sheen across the surface of the water, and he said, we've done some research, and yes, that can take place because of the very nature of asphalt cement. You've got lighter ends that will essentially float on the surface once it encounters the water column versus the more denser components of asphalt cement, which would sink into the water column, and if you look in the beginning of the regulations, it talks about oil sheen on the water as being one of the harms that the oil pollution prevention regulations, and in the statute, are designed to prevent. So an oil sheen I guess means, you know, I have in my head like the Exxon Valdez spill, and you look out of the ocean, and there's like, you know, it's black. The water is black. Is that what you're talking about? Yes, or you know, it looks iridescent sometimes. Right. There's a level of oil floating. So your expert said that if this material reaches this water, that type of phenomenon could happen. Correct. I'm not sure if I've captured, I'm sure there are other examples in the transcript, and obviously the ALJ did not go into a ton of detail on that second actual finding, but that's the one that jumped out at me. There's some different numbers in the brief. I'm just thinking about how one of us will write this. Sometimes it says 200 yards away. Sometimes it says 200 feet away. Which is it? How do we know? I'm fairly confident it's feet. Have I said yards already? I don't know why I should be confident that you're confident. I'm confident you're confident, but I'm not sure why that. We have the photograph in the brief that is standing on the property and the water is pretty close. It looks like 200 feet to me. Okay. I mean, 200 yards would be two football fields, which in the photograph would be three times. It doesn't seem right. That's all right. Yeah. I would like to bring up really quickly this notion of the failure provided at D1 or D2 calculation. That appears to me to be an invention of the SSS appellate briefing. In the court below, neither Mr. Michaud nor Ms. Casey, their expert, referred to their overland flow prediction spill calculation as a D1, D2. We would read those D1, D2 calculations as being required only when oil would flow into a storm drain. That's indicated in the regulations themselves. There's also a diagram showing the measures of distance to a storm drain and then from the storm drain to an outfall in the water. But we believe that in this case, D1 and D2 calculations were not required merely showing overland flow straight across the ground and into the water. Thank you. Thank you. Your honors, three quick points in rebuttal. First, the court asked about the cost of an FRP and I believe my friend pointed to the initial cost. It's also at least $7,000 to maintain a year. But more importantly here, your honor, I want to highlight that the penalty imposed in this case by EPA included over $100,000 based on concepts of culpability and seriousness. The analysis, if you look at the ALJ's decision, simply that BSS should have known that an FRP was required. We think that's not at all clear from the regulatory text. Second, your honor, I think the EAB briefing really shows that there was no second equal evidentiary basis for the conclusion that the oil would reach the water. EPA's EAB brief, and you can see this at page 15, it doubles down on the presumption. The heading of the only section addressing this issue is titled consideration of overland flow is not necessary because the facility is within 0.5 miles of navigable water. Nothing about the evidence. Now in our brief, your honor, we did point to the fact that EPA did not meet its burden to show substantial harm by a preponderance, including because it didn't do the D1 and D2 calculations. And you can see that at joint appendix page 395. And finally, your honor, I want to go to Judge Walker's point, which is that even if this court thinks that the ALJ backed up the conclusion that the product would reach the water based on the evidence, we have a second problem here. And that is that the EPA put forth no evidence going to this measurable adverse change concept. And if you look at the discussion of the oil sheen that my friend brought up, and it's at page 55 of the transcript, you know, all he says is that we've done some recent research that indicates that because of the nature of asphalt cement, you could have a sheet. But a page before that, he says, you know, this is a material, it's thermoplastic, it must be heated in order to flow. Once it encounters a water body, it will then start. So again, you know, EPA only relied on the presumption on that second issue. And so we think on that basis alone, the court should reverse and remand. Thank you, your honors. Thank you, Ms. Furman. Case is submitted.
judges: Katsas, Walker, Pan